Jerry D. CLARK, d/b/a, Ponderosa
Builders

v.

The UNITED STATES.

No. 1–82C.

United States Claims Court.

June 7, 1984.

J. William Bennett, Portland, Or., attorney of record for plaintiff.

Joseph T. Casey, Jr., Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard and Alexander Younger, Washington, D.C., for defendant.

## OPINION

WOOD, Judge:

In this action, before the court pursuant to section 10(a)(1) of the Contract Disputes Act, 41 U.S.C. § 609(a)(1) (1982), plaintiff sues to recover equitable adjustments, based upon three separate claims, aggregating $49,750.00. He alleges in essence that during the performance of a trail construction contract with the United States Forest Service ("Forest Service"), Department of Agriculture, he encountered a differing site condition (or, alternatively, "a defective specification, drawing" [sic]), and that he is also entitled to be compensated for two "changes" made during contract performance.

The case is presently before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. Upon consideration of the pleadings, the depositions, affidavits, and exhibits presently before the court, and the briefs and arguments of counsel, it is concluded that there is no genuine issue as to any material fact, and that defendant is entitled to judgment as a matter of law. Accordingly, plaintiff's complaint will be dismissed pursuant to RUSCC 58.

I

On July 10, 1979, the Forest Service mailed to a number of prospective bidders (including plaintiff) an invitation for bids for the construction of a project known as "Pacific Crest Trail 2000–14.6 & 7a, Toad-Deadfall Lakes, Mt. Shasta Ranger District, Shasta-Trinity National Forest" (sometimes hereinafter "the TDL trail project," or "the trail project"), in northern California.[1] That project involved 10.54 miles of new trail construction, beginning at Station 169 + 00, to the south of Toad Lake, and extending in a generally northerly direction to Station 432 + 75, north of Deadfall Lake.[2]

---

1. The Pacific Crest Trail extends from the northern border of the State of Washington to the southern border of the State of California, a distance of some 2,600 miles.

2. A station is 100 linear feet. The proposed trail construction included clearing, grubbing, and tread excavation, as well as drainage structures and rock retaining walls. The proposed trail

The IFB informed prospective bidders that pertinent drawings, specifications, and proposed terms might be obtained from the Forest Supervisor's Office in Redding, California, or viewed at a number of specified locations elsewhere, and that "Interested bidders may meet at the Weed [California] Post Office Parking Lot" at 8:30 A.M., July 24, 1979, with a Forest Service representative, who would "guide prospective bidders to the ending project station * * *" north of Deadfall Lake. Prospective bidders were also advised that they might contact a named Forest Service Engineer (who subsequently became the contracting officer's representative on the TDL trail project) for additional information.

The IFB's "Schedule of Items—Bid Schedule" listed eight items, including trail clearing, trail grubbing, and trailway excavation. The IFB's "Estimated Quantity" for each of these three items was 55,625 feet. The IFB specified a "LIN. FT." Unit, and asked for a "Unit Price" bid and total amount for each item.[3] The solicitation expressly cautioned prospective bidders to "INSPECT THE CONSTRUCTION SITE" prior to submitting a proposal on the project. Standard Form 22 (Rev. 2–78), 41 C.F.R. § 1–16.901–22 (1979), "Instructions to Bidders (Construction Contract)," and Standard Form 23A (Rev. 4–75), 41 C.F.R. § 1–16.901–23A (1979), "General Provisions (Construction Contract)," both included in the bid package, also explicitly informed prospective bidders that they "should visit the site and take such other steps as may be reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof" (SF 22,

Clause 2) and that the "Contractor shall be responsible for having taken steps reasonably necessary * * *" to do so (SF 23, Clause 13).[4]

Around 1977, plaintiff built some 5 miles (called the Gumboot section) of the Pacific Crest Trail just south of the project site. The record indicates that he had looked at "a mile or so of this project when I was working there." While he "walked [from the north end of the TDL trail project] south for a half mile or so" in 1979, prior to submitting his bid, he did not attend the July 24, 1979, "show-me trip" mentioned in the IFB [5], nor did he walk the entire length of the TDL trail project at any time prior to submitting his bid.

Had plaintiff done so, the alleged "differing site condition" here claimed (*i.e.*, rock in excess of what he contends was "indicated" in the contract drawings, as described hereinafter) would admittedly have been readily apparent. More specifically, plaintiff's deposition testimony acknowledges that the "scope of work * * * that [he] would have had to have done on the work would have been apparent had [he] walked the entire trail * * *."

Bids on the TDL trail project were opened August 16, 1979. Plaintiff's low bid ($136,128.50) was some $15,600 lower than the Forest Service's own estimate, and some $24,450 less than that of the next low bidder. By letter dated August 17, 1979, the contracting officer so informed plaintiff, and requested that he "examine your bid in detail" and either verify it or take other appropriate action. By mailgram dated August 22, 1979, the contracting offi-

---

included two adjoining segments, from Station 169 + 00 to Station 306 + 50, and from Station 0 + 00 to Station 423 + 75.

**3.** Parenthetically, plaintiff's bid for "Trailway Excavation," when made, was $69,531.25 ($1.25 per linear foot for 55,625 linear feet of such excavation). The bid package, and plaintiff's contract, provided that "Measurement and payment for contract work will be made only for and under those pay items included in the Schedule of Items." Rock excavation *per se*, whether "talus" (hereinafter explained), rubble,

or otherwise, was not included as a pay item in the Schedule of Items.

**4.** SF 22, Clause 2, further provided that "The Government will assume no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of the contract, unless included in the invitation for bids, specifications, or related documents."

**5.** Neither did any other prospective bidder on the proposed TDL trail contract.

cer was advised that plaintiff's bid was "accurate and acceptable." On August 27, 1979, plaintiff's offer was accepted, and on September 7, 1979, two complete copies of the executed contract were mailed to plaintiff.

The contracting officer's September 7, 1979, letter to plaintiff advised that at a pre-work conference, to be held in the near future, "a starting work date" would be discussed and agreed upon. On October 2, 1979, however, the contracting officer, without any prior discussion with plaintiff, signed and transmitted to him a "Notice to Proceed" within ten calendar days from the day after palntiff's receipt of the notice. The issuance of the notice to proceed forms the basis for one claim to an equitable adjustment for a change.

Plaintiff received the notice to proceed on or about October 5, 1979. That same evening, the contracting officer's representative (COR), after being informed by plaintiff that a notice to proceed had been issued, offered to issue an order suspending work on the project until the following spring. Plaintiff declined that offer, subsequently moved some equipment to the project site, and worked on the project from October 15, 1979, to November 14, 1979, when an order suspending work effective November 13, 1979, was issued.[6]

Plaintiff's contract included "Plans For Proposed Forest Development Trail," consisting in part of a twelve-page "Straight Line Diagram" of the proposed TDL trail. The diagram had been designed by a Forest Service inspector in December 1977, utilizing trail notes as to topography, grade, side slope, ground cover, and ground material along the proposed trail compiled by a Forest Service survey crew chief in 1976. After completing his design, the inspector walked the entire trail, taking the straight line diagram with him, and comparing it with his actual observations.

The straight line diagram contained a number of columns, including "Topography (Streams, Draws, Etc.)", "Side Slope %", "Trail Grade %", "Station", "Bed Width", "Special Section * * *", "Drainage Items * * *", and "Construction or Reconstruction". In passing, while the trail notes available to the Forest Service included data on ground material, the straight line diagram did not include either a "Ground Material" column or even any information on ground material as such. Opposite each column heading listed appeared, in horizontal line diagram (or bar graph) form, certain data concerning the proposed TDL trail construction work.

Of particular present interest is the "Topography" column, which, in broad terms, indicated the general location of meadows (wet and dry), seasonal and other creeks, ridges, bluffs, saddles, junctures with other trails, a spring, a barbed wire fence, and (from Station 240 to Station 264) "Talus."[7] The straight line diagram did not otherwise indicate the presence of "Talus," rubble, or any other kind of rock throughout the entire 10.54 mile length of the proposed trail.

Work on the TDL project continued over three seasons, from October 1979 to about October 19, 1981, when the project was completed. On May 26, 1981, a Forest Service inspector, on behalf of the COR, gave plaintiff a "Resume Work" order, and attempted to give him a work order requesting that plaintiff submit a time schedule of proposed progress and a plan of

---

**6.** While plaintiff ostensibly doubted the COR's authority to suspend work, he did not bring the matter to the contracting officer's attention at any time in 1979.

**7.** Deposition testimony by Forest Service personnel herein indicates that talus is rock that has fallen from a cliff or slope and is piled up (generally at the angle of repose) at the base of the cliff or slope. That testimony is consistent with dictionary definitions of the word: *e.g.,*

"Talus * * * *Geol.* a sloping mass of rocky fragments at the base of a cliff * * *." The Random House Dictionary of the English Language 1451 (1967); *see* also Webster's New World Dictionary of the American Language 1452 (1980), for a substantially identical definition. While plaintiff's definition of "talus" includes rubble, the seeming difference does not give rise to any genuine issue of material fact.

operation by June 7, 1981.[8] Plaintiff declined to accept the work order from the inspector, indicating that he would prefer to deal with the COR. On June 1, 1981, the COR personally delivered the work order to plaintiff, and plaintiff acknowledged receipt of it. On deposition, plaintiff testified that he (and his wife) spent some 4⅓ hours preparing a response to the work order. Plaintiff did not, however, submit the requested progress schedule within seven, or even 10, days following June 1, 1981.

By letter, dated June 22, 1981, to the contracting officer, plaintiff stated that there was an "inconstancy" between the amount of talus shown on the straight line diagram and "the amount on the ground." By letter, dated August 27, 1981, to the contracting officer, plaintiff asserted that he had encountered during construction some 16,228 feet of "talus," and that this represented a 676 percent increase over the amount "indicated" on the straight line diagram. An equitable adjustment therefor in the amount of $48,000 was requested. The contracting officer denied the claim September 18, 1981.

By letter, dated November 16, 1981, to the contracting officer, plaintiff asserted two additional claims for an equitable adjustment under the contract "Changes" clause. One, in the amount of $1500, was occasioned by the contracting officer's notice to proceed in October 1979. Plaintiff asserted in substance that he had incurred additional costs in consequence of the timing of the issuance of the notice to proceed. The other claim was based upon the June 1, 1981, work order referred to above. Plaintiff's position seems to have been that the work order required action from him in less than the contractually provided time and therefore amounted to a change, and that an equitable adjustment of $250 was due therefor. Both claims were denied by the contracting officer December 18, 1981.

## II

### A. The Differing Site Conditions Claim

Plaintiff's claim for an equitable adjustment of $48,000 in consequence of a Type I Differing Site Condition (or, alternatively, for a "defective specification, drawing" [sic]) rests on the premise that, in performing the trailway excavation required to construct the TDL trail, he encountered far more "talus" (and, to plaintiff, "talus and rubble are the same thing") than his contract "indicated."[9] The contention is unfounded.[10]

"Success on a Type I Differing Site Conditions claim * * * turns on the contractor's ability to demonstrate that the conditions 'indicated' in the contract differ materially from those it encounters during performance. * * * As a threshold matter, then, this kind of Differing Site Conditions claim is dependent on what is 'indicated' in the contract. * * * A contractor cannot

---

**8.** Plaintiff's contract provided that "within 10 days after request or 10 days after notice to proceed, whichever is sooner," the contractor "shall * * * file with the Contracting Officer * * *" a progress schedule and plan of operation, and that "The Contracting Officer may require the Contractor to submit a revised progress schedule programing [sic] the remaining work to insure completion of the work within the contract time."

**9.** The Differing Site Conditions Clause in plaintiff's contract encompassed "Subsurface or latent physical conditions at the site differing materially from those indicated in this contract" (Type I) or "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract" (Type II). *See*

*P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913 at 916 (Fed.Cir.1984). There is no contention that plaintiff encountered a Type II differing site condition.

**10.** Summary judgment is appropriate only when there is no genuine issue of material fact, and in considering whether this case is presently ripe for summary disposition, plaintiff rightly urges that all doubts are to be resolved against defendant as the moving party. *South Louisiana Grain Services, Inc. v. United States,* 1 Cl.Ct. 281, 289 (1982); *Ball v. United States,* 1 Cl.Ct. 180, 183 (1982). A mere suggestion that a genuine issue of fact *might* surface were a case to be permitted to proceed to trail is, however, insufficient to preclude allowance of a well-founded dispositive motion. *D & S Universal Mining Co. v. United States,* 4 Cl.Ct. 94, 96 (1983).

be eligible for an equitable adjustment unless the contract indicated what those conditions would supposedly be. * * * " *P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913 at 916 (Fed.Cir. 1984) (footnote and citations omitted).

■ Determining whether plaintiff's contract with defendant contained "indications" regarding the amount of rock that would be encountered during trailway excavation is a matter of contract interpretation, and thus presents a question of law for the court to decide. *P.J. Maffei,* at 916; *see also J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 51 n. 5 (1983). In the process, it is appropriate to view the question from the perspective of a " 'reasonable and prudent' contractor," or bidder, and to decide how such a "reasonable and prudent" bidder in the plaintiff's situation would act. *P.J. Maffei,* at 917.

Plaintiff, who did not walk the entire length of the trail prior to bidding (but who admittedly did encounter rock during his walk from Station 423 + 75 at the north end of the project about a half mile or so in a southerly direction[11]) necessarily contends that a single reference, in the "Topography" column of the straight line diagram, to talus between stations 240 and 264, amounted to an "indication," or representation, by defendant that plaintiff would encounter no other "talus" (or, for that matter, rock, however termed) throughout the entire 10.54 mile length of the TDL trail project. That contention simply cannot be accepted.

"While * * * a contract indication need not be explicit or specific, the contract documents must still provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those encountered. * * *. '[T]here must

be reasonably plain and positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance.' * * * " *Id.,* at 916 (citations omitted).

■ Even assuming talus (or rubble) to be a "subsurface" or "latent" physical condition, (*cf.* nn. 7 & 9, *supra* ), plaintiff cannot and does not point to any such "reasonably plain and positive indications." No reasonable and prudent contractor in plaintiff's situation could or would have understood the mere depiction of a topographical feature, unaccompanied by any reference whatever to the amount of rock to be encountered in excavating 10.54 miles of trailway, as an "indication" of subsurface rock conditions over the entire length of that project.

This conclusion is buttressed by the IFB's caution to interested persons to visit and inspect the construction site prior to bidding; the Forest Service's proffer of a show-me trip; its designation of a Forest Service engineer to furnish additional information on request; and the contract's explicit placement of responsibility for "having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work and the cost thereof" on the successful bidder.

■ Also to be borne in mind is that the contract provided for payment for trailway excavation on a linear footage basis (with no differentiation for the kind of material that might be encountered).[12] There is no reference to talus, rubble, or rock in the contract quantity estimate list (or in the Schedule of Items), and there is no information on ground material as such in the

---

11. Plaintiff was experienced in trail construction and reconstruction, and had in fact built a trail just south of the TDL project area (on which he had had "talus problems"). He obviously knew talus (and rubble) were common in the area of the TDL trail project. Indeed, his deposition testimony was that "The entire Trinity Divide is made up of rock."

12. While defendant seems to suggest otherwise, the contract did not explicitly allude to unclassified excavation. It did provide, however, that "Measurement and payment for contract work will be made only for and under those pay items included in the Schedule of Items," and a specified, estimated, quantity of linear footage of trailway excavation is the only relevant pay item "included in the Schedule of Items."

entire straight line diagram. In all the circumstances, it is clear that the Forest Service made no representations, and gave no "indications," as to the nature or volume of the material to be excavated, but rather placed upon interested bidders the responsibility of determining for themselves the work that would have to be performed if awarded the contract.[13]

■ Moreover, the record before the court abundantly establishes that the claimed differing site condition was not only not "reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding," but, rather, that plaintiff knew, " 'or should have known the facts of the conditions at the site * * *.' " *Mojave Enterprises v. United States*, 3 Cl.Ct. 353, 357–58 (1983). "Nothing in the bid documents could or did induce 'reasonable reliance by [plaintiff] that subsurface conditions would be more favorable than those encountered' "; here, as there, plaintiff " 'is unable to prove that [he] was misled by the contract' * * *." *Id.*, 3 Cl.Ct. at 357–58.

■ Plaintiff's reliance upon an alleged colloquy with a Forest Service employee respecting talus is, all else aside, misplaced.[14] In the bid package, defendant effectively disclaimed all "responsibility for any understanding or representation concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations * * * are expressly stated in the contract," and the "representation" on which plaintiff relies manifestly was not. Giving plaintiff the benefit of all doubt, no issue of material fact arises, nor does the claimed allusion to the straight line diagram strengthen plaintiff's claim.

In sum, plaintiff is not entitled to an equitable adjustment for either a differing site condition, or a constructive change on account of "talus."

### B. The "Changes" Claims

Plaintiff's claims for an equitable adjustment of $1,500 in consequence of the October 1979 notice to proceed, and of $250 in consequence of the alleged failure to afford him a contractually required period of time within which to furnish a schedule of proposed progress and a plan of operation, are also devoid of any merit.

■ With respect to the first of these claims, the record establishes that on the very same day plaintiff received notice to proceed, the COR offered him a suspension of work—in effect, a withdrawal of the notice to proceed—until the following spring. That offer, a tender of full redress for any possible error that might have been committed in issuing the notice to proceed (and plaintiff points to no real error in the issuance) was flatly rejected by plaintiff. Having chosen not to accept the government's offer, but rather to proceed with construction notwithstanding the approach of winter, plaintiff may not now be heard to complain. In the narrow facts and circumstances of this case, the responsibility for any increased costs incurred because he began work in mid-October 1979 is plainly not defendant's.[15]

■ Plaintiff's progress schedule claim is, for several reasons, also untenable. First, it is by no means clear that plaintiff was entitled to a 10 day-time period within which to submit a *revised* progress sched-

---

13. Plaintiff alternatively alleges that the increased amount of rock "encountered is a constructive change (defective specification)." The reasons undermining plaintiff's differing site conditions claim apply equally here.

14. On deposition, plaintiff referred to a pre-bid conversation with a Forest Service inspector, during which plaintiff asked whether he would "have any more talus problems." At three separate places in the transcript, plaintiff quoted the employee's response as "It's all taken care of." In describing the response a fourth time, plain-

tiff added to the quoted words "And, it's on the straight line diagram."

15. Plaintiff's unfounded doubt as to the COR's authority to suspend work furnishes no basis for any different conclusion. An inquiry to the contracting officer about suspending work easily could have been, but was not, made. Simply plowing blindly ahead without question, as plaintiff did notwithstanding defendant's offer, was scarcely reasonable.

ule. *See* n. 8, *supra.* In fact, however, he was on notice on May 26, 1981, *more* than 10 days prior to June 7, 1981, that he would be required to submit a proposed progress schedule and a plan of operation. Even assuming a technical departure from contract terms, affording him less than 10 days' *written* notice that he must do so patently caused him no monetary harm. Moreover, plaintiff did not submit the requested schedule and plan within seven (or even 10) days after his receipt of the written work order that he do so. In all the circumstances, this claim is specious.

### C. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted, and the plaintiff's complaint will be dismissed.